Filed 3/25/21  In re A.J. CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| In re A.J., a Person Coming Under the Juvenile Court Law. | C090530 |
| SACRAMENTO COUNTY DEPARTMENT OF CHILD, FAMILY AND ADULT SERVICES, Plaintiff and Respondent, v. J.J., Defendant and Appellant. | (Super. Ct. No. JD238820) |

J.J., father of minor A.J., appeals from the juvenile court's orders adjudging the minor a dependent, removing him from parental custody, and denying father reunification services.  (Welf. & Inst. Code, §§ 361, 361.5, & 395.)[1]  Father contends the juvenile

_____

[1]  Undesignated statutory references are to the Welfare and Institutions Code.

1

court erred in denying him reunification services under section 361.5, subdivision (b)(6). We shall affirm.

FACTUAL AND PROCEDURAL BACKGROUND

On February 8, 2018, A.J., then age five months, was brought to the hospital by ambulance due to seizing and vomiting. Once there, he was examined and found to have a right subdural hemorrhage (bleeding in the brain). A.L. (mother) and J.J. provided explanations that were not consistent with the injuries A.J. had sustained. The emergency room doctor indicated A.J.'s injuries were suspicious because the bleeding could not have been caused by a seizure. A.J. was transferred to a pediatric specialty center at another hospital. There, Dr. Julia Magana examined a CT scan and consulted with a neurology specialist. The neurologist observed that the collection of blood between the skull and brain was large. Dr. Magana believed that some of the blood looked older and some newer, suggesting the possibility of prior trauma. Dr. Magana found no skull fracture or swelling, and she determined that brain bleeding was not caused by the seizures.

Dr. Magana met with the parents. Father claimed that he laid A.J. in a pack-n-play and went to the bathroom, and when he returned A.J. was rolled over and crying differently. A.J.'s body went limp and his breathing became irregular. Father did not call 911 but instead called mother to explain the situation and took A.J. by car to mother's place of employment, which was five minutes away. It was later determined that father called mother at her place of work between 8:00 and 8:15 p.m. The mother clocked out of work at 8:41 p.m., and 911 was called at 8:52 p.m. Upon father meeting mother there in the parking lot, A.J. began to foam at the mouth and shake like he was having a seizure. It was at that time that mother and father decided to call 911. Mother reported that while in the ambulance with A.J., he continued to shake and threw up multiple times. Mother informed Dr. Magana that when she first saw A.J., he was unresponsive and looked dead. Dr. Magana concluded that with no other medical reason for the head trauma, the injury was most likely abusive head trauma caused by shaking.

2

On February 9, 2018, mother and father met with an investigating social worker from the Sacramento County Department of Child, Family and Adult Services (Department), formerly the Department of Health and Human Services. The parents provided the same account that they had given to Dr. Magana the prior day, adding that nothing was unusual leading up to father finding A.J. in distress and that it was not possible for A.J. to have fallen or bumped his head. The social worker also met with the paternal grandmother. The paternal grandmother informed the social worker that father was "intellectually compromised," but she could not comment on father's abilities as a father because she had not seen him since the child was born. Also interviewed, the maternal grandmother stated that mother and father had been together for about two years and seemed very happy and caring with A.J.

On February 13, 2018, Dr. Magana reported that an MRI confirmed A.J. suffered a subdural hematoma, and that an eye exam further revealed severe amounts of blood in multiple layers behind A.J.'s eyes. Dr. Magana stated that this indicated that the child's injuries were abusive head trauma. The potential long-term effects of A.J.'s injuries included developmental delays, a possible seizure disorder, and most likely a loss of vision or vision problems. Dr. Magana stated that she had found no medical reason for A.J.'s injuries, maintaining that the parents were not disclosing any potential cause of the trauma. Father asserted the injuries were not a result of abuse and denied shaking the infant. The medical team determined that the parents' failure to contact 911 when the child was limp and unresponsive for an hour was not a normal response and was concerning. The medical team conducted extensive studies of the infant and determined that there were no medical explanations as to how the injuries were sustained, besides inflicted head trauma.

On February 15, 2018, the Department filed a section 300 petition on behalf of five-month-old A.J., alleging that the minor had suffered severe abuse and was a minor described by section 300, subdivisions (a), (b), and (e). The juvenile court found prima

3

facie evidence supported the Department's petition. Father was found to be the presumed father. Upon A.J.'s release from the hospital, he was placed in a confidential foster home. A criminal case against father concerning A.J.'s injuries commenced.

On July 29, 2018, pending the contested jurisdiction and disposition hearings, father was arrested for domestic violence, wherein the mother sustained a scratch to her finger after father "smashed" her hand during a dispute due to father "going out and drinking almost every night and going to a strip club."

On November 13, 2018, the Department filed an amended section 300 petition, correcting the date of the alleged incident and removing mother's name from the subdivisions (a), (b), and (e) allegations. At a continued jurisdictional hearing, the court sustained the amended section 300, subdivisions (a), (b), and (e) allegations. Mother had ended her relationship with father and moved into a new apartment with her aunt in November 2018. The dispositional hearing was continued to allow time for the Department to complete an assessment of mother's home. Mother began an extended visit with A.J.

On December 18, 2018, at a dispositional hearing, the court ordered A.J. placed with mother under a family maintenance plan. No family reunification services were ordered for father, and the court ordered father shall not reside in the home with mother and A.J.

Father was authorized two, 1-hour supervised visits per week. Father canceled some visits, commonly citing his work schedule as the cause, but when he did attend visits, his interactions with A.J. were described as typically being 100 percent positive and relaxed. Father and A.J. laughed and played throughout their visits together, with father engaging A.J.'s imagination and curiosity. Father was responsive to A.J.'s cues.

On March 14, 2019, the Department filed a section 387 supplemental petition due to mother's failure to comply with court orders. It was alleged that mother had failed to engage in court-ordered services, was not making A.J. available to the Department, had

4

been unable to keep the Department aware of A.J.'s whereabouts, and failed to keep the Department apprised of A.J.'s medical condition. As a result, A.J. was again detained.

The Department subsequently recommended that family reunification services for mother be provided. As for father, the Department recommended that services be bypassed pursuant to section 361.5, subdivision (b)(5) and (6). As to the applicability of section 361.5, subdivision (c), the Department argued that there was no clear and convincing evidence showing that A.J. would benefit if family reunification services were provided to father due to the severity of the injuries and because father was unable or unwilling to provide an explanation for A.J.'s injuries.

On August 23, 2019, at a contested jurisdictional and dispositional hearing on the Department's section 387 petition, father was present. Father objected to the out-of-home placement and Departmental recommendation to not place A.J. in his care. However, father's main issue at trial was his request for reunification services. Father argued that it would not be in A.J.'s best interest to deny him family reunification services. Counsel for father informed the court that father had voluntarily completed a parenting class, attended A.J.'s medical appointments, participated in positive visits with A.J., and very much loved his son and desired to reunify with him. Counsel reminded the court that father had attended every hearing and that granting family reunification services for father in conjunction with mother's services would not delay any type of permanency for A.J. Counsel for father stated that although section 300 allegations against father concerning very serious injuries to A.J. had been sustained, father had maintained that he never neglected or physically abused A.J. Counsel for A.J. reminded the court that although his client had suffered very grievous injuries and allegations that father caused the injuries had been sustained, services remained discretionary. Counsel for A.J. believed that if acknowledgment of the injuries could be ameliorated through services and if father could parent A.J. appropriately, then A.J. would want to reunify.

The court found the supplemental section 387 allegations true and deemed A.J.'s removal from parental care to be necessary and appropriate. The court found the extent of progress made by mother minimal and the extent of progress made by father fair. The court granted mother family reunification services and scheduled a six-month review hearing. As for father, the court ordered services bypassed pursuant to section 361.5, subdivision (b)(6), and under section 361.5, subdivision (c) found no clear and convincing evidence that father should receive family reunification services. Accordingly, the court ordered family reunification services shall not be offered to father. However, regular supervised visitation for father was ordered to continue and moved to the weekends in order to accommodate father's work schedule. The court noted, "At this point I cannot find by clear and convincing evidence that the father should receive services. It does appear that [father] is doing well and is visiting with the child. And as time goes on, [counsel for father], you can file a [section] 388 [petition] for him." The court then informed father that he believed that father caused A.J.'s injuries. The court expressed concern that because father did not admit that he caused the injuries, it was difficult to believe that abuse would not happen again.

DISCUSSION

Father contends that the juvenile court abused its discretion in declining to grant him reunification services because it was in the child's best interest to do so. We disagree.

When a child is removed from the parent's home, reunification services may be offered to the parent " 'in an effort to eliminate the conditions leading to loss of custody and facilitate reunification of parent and child. This furthers the goal of preservation of family, whenever possible. [Citation.]' [Citations.] Section 361.5, subdivision (b) sets forth certain exceptions—also called reunification bypass provisions—to this 'general mandate of providing reunification services.' [Citations.]" (*In re Allison J.* (2010) 190 Cal.App.4th 1106, 1112.) "When the court determines a bypass provision applies,

6

the general rule favoring reunification is replaced with a legislative presumption that reunification services would be ' "an unwise use of governmental resources." ' " (*Ibid.*)

Section 361.5, subdivision (b)(6)(A) provides for the denial of reunification services to a parent who has inflicted severe physical harm upon the child. Subdivision (c) provides, in pertinent part, that "[t]he court shall not order reunification for a parent or guardian described in paragraph . . . (6) . . . of subdivision (b) unless the court finds, by clear and convincing evidence, that reunification is in the best interest of the child." Parents bear "the burden of proving, through competent testimony, the factual predicates to an order for reunification services . . . ." (*In re A.E.* (2019) 38 Cal.App.5th 1124, 1148.) To determine whether reunification is in the child's best interest, "[t]he juvenile court should consider 'a parent's current efforts and fitness as well as the parent's history'; '[t]he gravity of the problem that led to the dependency'; the strength of the bonds between the child and the parent and between the child and the caretaker; and 'the child's need for stability and continuity.' " (*In re William B.* (2008) 163 Cal.App.4th 1220, 1228.) A best interest finding requires a likelihood reunification services will succeed; in other words, "some 'reasonable basis to conclude' that reunification is possible . . . ." (*Id.* at pp. 1228-1229.) The juvenile court has broad discretion when determining whether reunification services would be in the minor's best interests. (*Id.* at p. 1228.) We reverse that determination only for abuse of discretion. (*Id.* at pp. 1228-1229; *In re Christopher H.* (1996) 50 Cal.App.4th 1001, 1006.)

We find no abuse of discretion. Here, the trial court found by clear and convincing evidence that section 361.5, subdivision (b)(6) applied given the severe physical harm inflicted on A.J. by father in February 2018. The court found that father was solely responsible for A.J.'s severe head trauma and sustained the amended petition alleging section 300, subdivisions (a), (b), and (e). The court concluded it could not find by clear and convincing evidence that it was in the child's best interest to override the exception. The court considered father's fitness and history, his efforts during visits with

7

A.J., the gravity of the injury that led to the dependency, and father's failure to admit his abusive conduct that caused the injury.

The appellate court's reasoning in *In re A.E., supra*, 38 Cal.App.5th 1124 is instructive. There, the lower court sustained section 300, subdivisions (a) and (e) allegations, after A.E. sustained a subdural hematoma, among other head injuries. (*In re A.E.,* at p. 1128.) The lower court also found that by clear and convincing evidence, it was in the child's siblings' best interest to grant reunification services to both parents, though section 361.5, subdivision (b)(6) bypass applied. (*In re A.E.,* at p. 1140.) The lower court based the finding on the parents being actively engaged in their services, though the court stated the challenge for the parents would be " 'understanding and acceptance of responsibility for what happened.' " (*Id.* at p. 1140.) The Court of Appeal reversed, concluding the trial court abused its discretion in granting reunification services because the parents both continued to deny that they had ever abused the children or had even physically disciplined them, despite engaging in services. (*Id.* at pp. 1141-1142, 1144.) The court reasoned that the mother's explanation of the child sustaining the head injuries as a result of falling was contradicted by the medical expert, who had concluded that the injuries could not have been sustained by such a fall. (*Id.* at p. 1142.) Despite the mother identifying appropriate disciplinary techniques and attending classes, the court found that neither of these showed that services would likely lead to better parenting skills or were unlikely to prevent further abuse. (*Id.* at pp. 1143-1144.)

Here, as in *In re A.E.*, father continues to deny responsibility for A.J.'s injuries even though he was caring for the child alone when the injuries occurred and the medical experts found no possible medical explanation for A.J.'s injuries other than abusive head trauma caused by shaking. On this record, the trial court did not abuse its discretion in finding no clear and convincing evidence that it was in the child's best interest to override the exception.

8

In sum, the juvenile court considered the appropriate factors and did not abuse its discretion in finding father failed to meet his burden of showing that reunification services are in the best interests of the minor.

## DISPOSITION

The judgment and orders of the juvenile court are affirmed.

_____/s/_____
BLEASE, Acting P. J.

We concur:

_____/s/_____
HULL, J.

_____/s/_____
MAURO, J.

9